In re Donnie W. GILL and Ginger G. Gill, Debtors.

ISLAND BANK OF COLLIER COUNTY, Plaintiff,

v.

Donnie W. GILL and Ginger G. Gill, Defendants.

BARNETT BANK OF NAPLES, a Florida Corporation, Plaintiff,

v.

Donnie W. GILL and Ginger G. Gill, Defendants.

Bankruptcy No. 92–06908–9P7.
Adv. Nos. 92–705, 92–741.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Sept. 23, 1993.

Ronald L. Stetler, Naples, FL, for debtors/defendants.

F. Lorraine Jahn, Miami, FL, for plaintiff Island Bank.

Kevin A. Denti, Naples, FL, for plaintiff Barnett Bank.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS A Chapter 7 liquidation case. The matters under consideration are two separate assaults on the right to complete relief sought by Mr. and Mrs. Gill (Debtors) in this Chapter 7 case. One is mounted by Barnett Bank of Naples (Barnett) and the other by Island Bank of Collier County (Island Bank).

Barnett seeks a determination in its Complaint that the debt in the amount of $19,-070.89 shall be declared to be non-dischargeable based on § 523(a)(6) of the Bankruptcy Code. Particularly, it is Barnett's contention that Mr. Gill willfully and maliciously injured the property of Barnett by converting Barnett's collateral. The collateral was pledged by Mr. Gill to secure a loan granted by Barnett to High Tide, Inc., d/b/a/ Marco Rent–All, a corporation in which Mr. Gill was the principal, 50% shareholder with his wife, and its President.

The claim of Island Bank is also based on § 523(a)(6), claiming an unauthorized disposition of its collateral by Mr. Gill. In addition, Island Bank also challenges the Debtors' right to a general bankruptcy discharge based on § 727(a)(4) and 727(a)(5) of the Bankruptcy Code, respectively. In support of its claim, Island Bank contends that the Debtors committed a false oath in bankruptcy based on § 727(a)(5), and the Debtors failed to explain satisfactorily the loss of their assets to meet their liabilities pursuant to § 727(a)(4).

Before considering the merits of the respective claims of the two Banks, it should be pointed out that this record is totally devoid of any evidence which would warrant granting the relief sought against Mrs. Gill. Therefore, this Court is satisfied that it is proper to dismiss both complaints as they relate to the claims against her. Thus, the balance of the discussion will be limited to the claims asserted against Mr. Gill, hereinafter referred to as the Debtor.

It should be noted that if the record justifies the conclusion set forth by Island Bank, that the Debtor is not entitled to a general discharge, it would not be necessary to consider the claims of non-dischargeability asserted by both Banks. For this reason Island Bank's Objection to the Discharge of the Debtor will be considered first.

### Objection to Discharge by Island Bank § 727(a)(4) & (5)

At the time relevant to the matter under consideration, the Debtor and his wife were

the sole shareholders of Go–Go, Inc., a/k/a Collier RentAll, (Go–Go), a Florida Corporation. The Debtor was the President of Go–Go and in sole charge of its affairs. Sometime prior to April 3, 1990, the Debtor approached Island Bank and applied for a loan for Go–Go. The application was approved and Island Bank loaned Go–Go $65,097.50. As part of this transaction, the Debtor executed a Promissory Note in favor of Island Bank as President of Go–Go. This note was to mature on or before June 22, 1990. To secure this loan, Mr. and Mrs. Gill pledged a Certificate of Deposit (CD) in the amount of $85,694.69. In addition, Mr. Gill executed a guarantee in favor of Island Bank to provide further security to Island.

On June 22, 1990, the Bank agreed to roll over the loan for an additional 92 days. The renewal was documented by execution of a new note in the principal amount of $80,097.50 which was also secured by the same CD. This was also a time note and was to mature on September 22, 1990. On December 5, 1990, the note was renewed again with the execution of a new note in the principal amount of $80,000.00. This note was to mature on December 5, 1993, but unlike the previous notes, this note required, for the first time, monthly installment payments of $1,102.00 until maturity. This note, in addition to the CD pledged previously, was also secured by equipment and fixtures owned by Go–Go. All the notes discussed earlier were personally guaranteed by separate guarantees executed by the Debtor. Apparently, in June, 1991, for reasons not explained, Island Bank released the CD. This left the equipment and fixtures owned by Go–Go as the only collateral securing the outstanding obligation of Go–Go. Go–Go defaulted on its obligation to make monthly payments on the last note.

To further complicate the matter, the Debtor was a principal stockholder and officer of a Florida Corporation known as High Tide, Inc., a/k/a Marco RentAll (High Tide). On May 7, 1991, the Debtor approached Island Bank and sought a loan in the amount of $20,000.00 on behalf of High Tide. The application was granted and Island Bank loaned High Tide $20,000.00. The Promissory Note was signed by the Debtor as President of High Tide. This note was to mature on November 7, 1991, and required only monthly interest payments until maturity. The note was not secured by any collateral. On November 7, 1991, this note was renewed by the execution of a new note by the Debtor, again as President of High Tide, in the principal amount of $20,064.32. The note was also unsecured and, like the previous note, required only monthly interest payments until maturity. This note was to mature on May 7, 1992. Both the first and the second High Tide notes were personally guaranteed by the Debtor by separate guarantees executed by him on May 7, 1991. High Tide, just like Go–Go, defaulted on the note.

When Go–Go defaulted on its last note, Island Bank attempted to recover its collateral, the fixtures and equipment of Go–Go. Not able to locate its collateral, Island Bank sought the assistance of the Sheriff's Office of Collier County and requested an investigation to determine the whereabouts of its collateral. The detective in charge of the investigation contacted the Debtor who informed the detective that the collateral of Go–Go was stored at the business premises of High Tide and that Island Bank was free to repossess its collateral. The day after his visit with the Debtor, the detective visited the premises of High Tide and inspected certain inventory items which were identified by the Debtor's wife as Go–Go's collateral. The detective compared the inventory identified by Mrs. Gill with a list of Go–Go collateral furnished to him by Island Bank and found that the inventory which was on the premises matched most of the equipment listed on the schedule of the collateral given to the detective by Island Bank. The equipment was ostensibly displayed to be rented to the public and appeared to be in satisfactory condition. Having concluded that no violation occurred, the Sheriff's Office considered the matter closed.

Although it is not clear from the record, it appears that subsequently the Debtor

entered into a contract to sell all of the assets of High Tide to one Jeffrey Becker for $100,000.00. In contemplation of the proposed sale, the Debtor furnished Becker with a list of the assets to be included in the sale. Mr. Becker approached Island Bank and applied for a loan to finance the purchase. He submitted to Island Bank the list of the assets which were to be included in the purchase. The list furnished to Island Bank appeared to include the very same equipment which was pledged to Island Bank as security for the loan granted to Go–Go. When informed of this fact, Becker became alarmed and decided to conduct an inventory check of the assets offered for sale. When he compared the serial numbers of the equipment actually located on the premises of High Tide with the list of Go–Go equipment pledged as collateral to Island Bank, he discovered that a substantial amount of the equipment which he was to purchase was in fact the equipment pledged as collateral for Go–Go to Island Bank. In light of this unexpected turn of events, Becker notified the Debtor on August 3, 1992 that he was unwilling to proceed and go through with the sale. On the morning of the following day, Becker's son drove by the premises of High Tide and observed that substantially all of the equipment stored outside the building the previous day was no longer there.

In search of its collateral, Island Bank applied for and obtained a Writ of Replevin on August 4, 1992, and delivered the Writ to the Sheriff with directions to find its collateral and levy on the same. In addition, Island Bank requested the Sheriff's Department to reopen the investigation. The detective placed in charge of the investigation contacted the Debtor again who informed the detective that unfortunately, 90% of the equipment securing Island Bank's loan had either been sold or junked because rental equipment wears out quickly and has to be junked and replaced frequently. The Sheriff was unable to affect a levy since Island Bank collateral could no longer be located.

When confronted, the Debtor informed Island Bank that the remaining collateral was in a storage facility and the Bank was free to proceed to repossess what was left. Island Bank declined to repossess the equipment found in the storage facility because the serial numbers on the equipment did not match any of the serial numbers of the equipment listed on the original inventory of the collateral. On May 20, 1992, the Debtors filed their Petition under Chapter 7 of the Bankruptcy Code. In their Schedule of Assets, the Debtors failed to disclose their ownership of the stock in Go–Go or that the Debtor was an officer of Go–Go.

Basically these are the relevant facts established at the final evidentiary hearing which, according to Island Bank, would warrant the denial of the Debtor's discharge based on either § 727(a)(4) or § 727(a)(5), respectively.

The first claim of Island Bank that the Debtor is not entitled to a general discharge is based on § 727(a)(4) which provides as follows:

Section 727(a)(4)

(a) The court shall grant the debtor a discharge, unless—

. . . . .

(4) the debtor knowingly and fraudulently, or in connection with the case—

(A) made a false oath or account;

(B) presented or used a false claim;

In the alternative Island Bank asserts that the Debtor is not entitled to a discharge based on § 727(a)(5). Section 727(a)(5) provides . . .

(a) The court shall grant the debtor a discharge, unless—

. . . . .

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;

 It no longer can be gainsaid that the standard of proof required to deny discharge under § 727(a)(4) or (5) is no longer clear and convincing but merely the

352

preponderance of evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). To sustain a claim under § 727(a)(4), it is the burden of the creditor to establish by a preponderance of the evidence that the Debtor knowingly and fraudulently in connection with the case made a false oath or account.

While it is also true that the discharge provisions of the Bankruptcy Code are remedial in nature and, therefore, should be liberally construed in favor of the Debtor and against the creditor who challenges the Debtor's right to discharge, discharge is only available to honest Debtors.

It is undisputed that the Debtor neither disclosed his stock ownership in Go–Go nor did he disclose on the Statement of Financial Affairs that he was an officer and director of Go–Go. In defense, it is the contention of the Debtor that the omission was not willful and intentional and was merely an oversight due to the fact that Go–Go was out of business, and thus the stock was worthless.

Ordinarily an omission of an asset of very little or no value would not warrant denial of the general discharge. It is equally true, however, that the Debtor has an absolute obligation to make a full disclosure of all of his assets and liabilities. Further, it is not for the Debtor to determine the value of the assets or to determine if the assets do not have any value. *In re Ingersoll*, 124 B.R. 116 (Bankr. M.D.Fla.1991). There is no question that the creditors are entitled to a full and complete disclosure, and the creditor has the right to make that determination. *In re Kaiser*, 94 B.R. 777 (Bankr.S.D.Fla.1988).

It is without dispute that the Debtor shifted the collateral pledged not only to Island Bank but also to Barnett Bank as it suited his purpose. This shell game did prevent both Banks from asserting their legal right to their respective collateral. It was clear that when the "now you see it, now you don't" game was over, there was no collateral of any consequence at any place and the Debtor never furnished an adequate and satisfactory explanation of its disappearance. The assertion of the Debtor that this type of equipment has a short useful life and because of the type of usage they junked and discarded it, is simply not believable and as such must be rejected. It should be pointed out that on August 4, 1992, a day after the Debtor was told by Becker that he no longer wished to go through with the proposed sale, all equipment which was at the High Tide premises was gone and no satisfactory explanation was ever furnished for its disposition.

In sum, this Court is satisfied that Island Bank did establish with the requisite degree of proof, that the Debtor Mr. Gill is not entitled to a general discharge. It is unnecessary to consider the alternative claims of nondischargeability asserted by Island Bank and by Barnett Bank based on § 523(a)(2) or § 523(a)(6).

As noted earlier, nothing in this record warrants a denial of Mrs. Gill's discharge. The Bank's Complaint against her should be dismissed with prejudice. A separate Final Judgment will be entered in accordance with the foregoing in each adversary proceeding.